# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

IN RE

SUNBELT GRAIN WKS, LLC,

    Debtor

STEVEN L. SPETH, Trustee,

    Plaintiff,

vs.

WHITHAM FARMS FEEDYARD, L.P.,

    Defendant-Appellant,

  and

SECURITY STATE BANK,

    Defendant-Appellee.

Case No. 09-1222-EFM

**MEMORANDUM AND ORDER**

This case involves a dispute between Appellee Security State Bank and Appellant Whitham Farms Feedyard L.P. over whose interest in the sale proceeds of the bankruptcy debtor's grain inventory is superior. The United States Bankruptcy Court for the District of Kansas found, on summary judgment, that Security State Bank's interest took priority. Whitham Farms Feedyard L.P.

appealed. Exercising its jurisdiction under 28 U.S.C. § 158(a)(1), the Court affirms the bankruptcy court's decision.

## I.  BACKGROUND

In May of 2006, Jim and Kathy Shafer formed Sunbelt Grain WKS, LLC ("Sunbelt"). Sunbelt operated six grain storage facilities at various locations in western Kansas and had two lines of business. The first was purchasing grain, such as corn and wheat, from local farmers and reselling it to buyers. The second was storing grain for farmers for a fee.

Security State Bank ("SSB") was Sunbelt's lender. James Arnold is the president of SSB. In 2006 and 2007, Sunbelt executed several promissory notes in favor of SSB. In addition to these notes, Sunbelt also had a secured line of credit loan with SSB, which required Sunbelt to submit monthly borrowing base certificates. Sunbelt's indebtedness to SSB was secured by mortgages and by security agreements. Pursuant to the security agreements, SSB had a valid and properly perfected security interest in all of Sunbelt's accounts, rights to payment, inventory, equipment, instruments, chattel paper, general intangible documents, farm products and supplies, payment programs, investment programs, and deposit accounts.

Whitham Farms Feedyard L.P. ("Whitham") is a Colorado limited partnership and operates a feedyard near Leoti, Kansas. Stewart Whitham is a general partner. According to Mr. Whitham, Whitham had purchased corn from Sunbelt and its predecessor, Sunbelt Grain, Inc., whose principal was Vaughn Young, Ms. Shafer's father, for a number of years.[1]

On April 27, 2007, Sunbelt issued a Merchandising Target Offer ("MTO") to Whitham, proposing to sell it seven 100,000 bushel lots of corn at prices to be calculated based upon the

---

[1]Mr. Whitham alleges that Mr. Arnold was also Sunbelt Grain, Inc.'s banker.

futures market at the Chicago Board of Trade ("Board"). Under the terms of the offer, each lot would be sold at a price per bushel equal to a certain price quoted on the Board for future grain plus a mark-up.[2] The MTO also set out the months in which each lot would be available for delivery.

Whitham responded to Sunbelt's offer by agreeing to purchase five of the seven lots (500,000 bushels) at the price quoted. The sale and purchase of the 500,000 bushels of corn was confirmed by the execution of five Confirmation of Sale and Purchase ("CSP") forms – one for each of the five lots – on May 4, 2007. These forms, in addition to setting out the month in which the corn would be delivered,[3] also stated that the weight and grade of the corn would be determined at its destination, that the corn would be #2 yellow corn, and that Whitham would prepay for the corn on November 1, 2007. The record does not reflect how much grain was on hand at the time the CSPs were executed.[4] Both the MTO and CSPs provided that the rules of the National Grain and Feed Association (NGFA) would govern the transaction between the parties.

---

[2] For example, the MTO offered 100,000 bushels of corn for delivery in December 2007 to be priced at "28 H." This meant that corn delivered in that lot would be priced at the Board's March 2008 future price plus 28 cents.

[3] The first shipment was to occur in December 2007. Following this shipment, Whitham was to receive one shipment of grain every month until April 2007. According to Stewart Whitham, despite the fact that the CSPs set forth a specific time of delivery, Whitham could demand and receive a shipment of grain at a time earlier or later than the time delineated in the CSPs.

[4] At one point during her deposition, Ms. Shafer stated that Sunbelt did not have 100,000 bushels of corn on hand on the date these contracts were entered into, May 4, 2007. However, at another point, she testified that she did not know how much corn was on hand at that time. Whitham has not put forth any evidence showing how much corn was on hand.

On November 1, 2007, Whitham paid Sunbelt $2,099,750 for the five lots of corn to be delivered in the coming months.[5] Sunbelt deposited Whitham's check in its operating account at SSB, which, at that time, had a balance of $2,727.33. Upon deposit of Whitham's check, SSB swept $1.662 million from Sunbelt's account and applied it to pay down Sunbelt's line of credit. Over the next twenty-seven days, Sunbelt drafted $477,750 worth of checks to entities that Kathy Shafer's brother, Kevin Young, was a member of and/or held an ownership interest in.

On November 19, 2007, Whitham agreed to purchase an additional 80,000 bushels of corn for Sunbelt. Sunbelt confirmed this purchase with two more CSPs, one for each 40,000 bushel lot. The first lot was to be delivered sometime in December 2007, and the second sometime in January 2008. Once again, the record does not reflect how much corn was on hand at the time these CSPs were executed.[6] Whitham paid $326,400 for this grain on November 20, 2007. Sunbelt deposited Whitham's check in its operating account at SSB.

Whitham received no bills of sale or warehouse receipts for the corn it paid for in November 2007.[7] Furthermore, Whitham was neither charged nor paid any storage fees to Sunbelt for the corn Sunbelt agreed to sell Whitham in May 2007. Sunbelt bore the risk of loss associated with the corn until the corn was delivered to Whitham.

On December 6, 2007, Kathy Shafer contacted James Arnold and requested a prompt meeting. At the meeting, Shafer informed Arnold that Sunbelt had suffered considerable

---

[5] Because the earliest delivery month for the contracts then in existence was December, Whitham did not take delivery of any corn on the day that he prepaid.

[6] Ms. Shafer testified during her deposition that, as of November 19, 2007, Sunbelt had taken in 1.467 million bushels of corn. However, Ms. Shafer was unable to state how much of that grain was actually on hand on November 19. Whitham has offered no evidence of how much grain was on hand that day.

[7] According to Stewart Whitham's affidavit, Whitham had demanded and received warehouse receipts from Sunbelt in the past to evidence Whitham's ownership in corn held by Sunbelt.

monetary losses in the commodities future market from September through December 2007. This was the first time that Shafer had so advised SSB. According to Arnold, despite the fact that Sunbelt had failed to timely provide its borrowing base certificates to SSB for the previous three months, this was when SSB first learned that Sunbelt was out of position. Because Sunbelt was in default of the terms and conditions of its loans, SSB closed Sunbelt's line of credit the next day, December 7.

On December 14, 2007, SSB commenced a state court foreclosure proceeding in the District Court of Greeley County, Kansas, asserting a security interest in Sunbelt's grain inventory. According to Stewart Whitham, on that same date, Mr. Arnold visited him at the feedyard and told him, as Sunbelt was in the process of unloading corn, that "I hate to get in between your cows and your corn, but I'm going to foreclose on Sunbelt." Mr. Whitham also alleges that he contacted both Ms. Shafer and Karen Allen, Sunbelt's operations manager, on December 14 and they confirmed that Whitham's corn was in Sunbelt's inventory.

Due to the commencement of the foreclosure proceeding, Sunbelt was forced to stop its shipments of grain to Whitham after delivering only 57,000 bushels of the 580,000 that Whitham had contracted for. In January 2008, the Kansas Department of Agriculture commenced a state court receivership action against Sunbelt and the state court appointed Terry D. Criss as receiver to take control of the assets.

On February 4, 2008, SSB, in concert with two other petitioners, filed an involuntary Chapter 7 petition against Sunbelt. Steven L. Speth was appointed as the Chapter 7 trustee. Pursuant to an order issued by the bankruptcy court, the trustee sold Sunbelt's existing grain inventory and distributed the proceeds. After distributing proceeds to parties storing grain at

Sunbelt's facilities, the trustee held approximately $3.875 million for distribution to creditors. SSB claimed priority to $3.2 million of the proceeds, while Whitham claimed priority to $2.2 million.

Desiring to have the bankruptcy court determine the validity, priority, or other interest of SSB and Whitham in the remaining proceeds from the sale of Sunbelt's grain inventory, the trustee brought an adversary action, naming both SSB and Whitham as defendants. In its answer, SSB stated that its interest was superior to Whitman's because SSB had a properly perfected security interest in the grain and the grain sale proceeds. In its answer, Whitham asserted that it was entitled to the proceeds for two reasons: first, its interest in the proceeds was superior; second, the doctrine of equitable subordination applied.

On January 19, 2009, SSB filed a motion for summary judgment on the trustee's complaint, claiming that Whitham had no ownership interest in Sunbelt's grain, that Whitham was not a buyer in the ordinary course, and that there was no basis for applying the doctrine of equitable subordination. The trustee did not oppose SSB's motion. On June 18, 2009, the bankruptcy court granted SSB's motion, finding that SSB's interest was superior to Whitham's because Whitham was not a buyer in ordinary course, as it had no ownership interest in Sunbelt's corn, and that the doctrine of equitable subordination was not applicable. Whitham filed a notice of appeal on June 29, 2009.

## II. STANDARD OF REVIEW

In reviewing a bankruptcy court's grant of summary judgment, the district court reviews the case *de novo* applying the same legal standards used by the bankruptcy court, namely Fed. R.

Civ. P. 56(c).[8] The court "examine[s] the record to determine whether any genuine issue of material fact exists, and, if not, whether the substantive law was applied correctly."[9] The Court is "free to affirm a grant of summary judgment on grounds different than those used by the [bankruptcy] court if the record is sufficient to support such grounds."[10]

### III. ANALYSIS

The issues now before the Court are: (1) whether the bankruptcy court erred in finding that Whitham was not a buyer in ordinary course; and (2) whether the bankruptcy court erred by holding that the doctrine of equitable subordination was not applicable. The Court will address these issues in turn.

**Whitham's Status as a Buyer in Ordinary Course**

The determination of whether Whitham is a buyer in ordinary course ("BIOC") is significant because a BIOC "takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."[11] Thus, if Whitham can

---

[8] *See Stat-Tech Int'l Corp. v. Delutes (In re Stat-Tech Int'l Corp.)*, 47 F.3d 1054, 1057 n.1 (10th Cir. 1995); *Miller v. Gentry (In re Miller)*, 169 B.R. 715, 719 (D. Kan. 1994). SSB argues that the Court must review the bankruptcy court's findings of fact under the clearly erroneous standard. The Court disagrees. A court's statement of uncontroverted facts in a summary judgment order is not entitled to deference upon review because the court has not weighed and resolved disputed factual issues. *See Heiniger v. City of Phoenix*, 625 F.2d 842, 843 (9th Cir. 1980); *see also* Fed. R. Bankr. P. 8013 advisory committee's note (stating that Rule 8013 accords to the findings of a bankruptcy judge the same weight given to the findings of a district court judge under Fed. R. Civ. P. 52). As a result, the Court will review the record before it *de novo*. *See Kirtley v. Sovereign Life Ins. Co. (In re Durability Inc.)*, 212 F.3d 551, 555 (10th Cir. 2000).

[9] *Octagon Gas Systems, Inc. v. Rimmer*, 995 F.2d 948, 952 (10th Cir.), *cert. denied*, 510 U.S. 993 (1993).

[10] *In re Stat-Tech Int'l Corp.*, 47 F.3d at 1057.

[11] *See* Kan. Stat. Ann. 84-9-320(a). Conversely, if the buyer is not a BIOC, the secured party's interest in the collateral continues, even if a sale has occurred. *See* Kan. Stat. Ann. § 84-9-315(a)(1); *see also* Kan. Stat. Ann. § 84-9-201(a) ("a security agreement is effective according to its terms . . . against purchasers of collateral").

meet the definition of a BIOC, its interest in the proceeds from the grain sale would be superior to SSB's. Under Kan. Stat. Ann. § 84-1-201(9), a buyer in ordinary course is defined as

> a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. . . . Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under article 2 of chapter 84 of the Kansas Statutes Annotated and amendments thereto, may be a buyer in ordinary course of business. "Buyer in ordinary course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

The bankruptcy court held, albeit indirectly, that Whitham was not a BIOC because title of the corn never transferred to Whitham. The bankruptcy court's conclusion that title had not transferred rested upon two independent grounds: first, the goods were never identified, as they were not in existence on the date that the contracts were entered into and were never shipped, marked, or otherwise designated by Sunbelt as goods to which the contract referred; second, rule six of the NGFA, which the CSPs explicitly incorporated by reference, states that title of the corn was to transfer upon delivery. Because the court concluded that title to the corn had not transferred, the Court did not address the question of whether Whitham had taken possession of the goods or had a right to recover the goods from Sunbelt under article 2.

On appeal, Whitham argues that the bankruptcy erred because title is not a condition precedent to a buyer of a debtor's inventory acquiring BIOC status. According to Whitham, as long as the goods in question are identified, a buyer can qualify for BIOC status. SSB disagrees. In its response, SSB claims that if title is not transferred, a buyer of goods cannot be a BIOC.

The question of when a buyer of goods becomes a BIOC has been the subject of considerable debate. Much, if not all, of the debate has stemmed from the fact that the former definition of buyer in ordinary course did not specify the point at which BIOC status was conferred.[12] In the absence of statutory guidance, courts were forced to formulate their own tests for determining whether a buyer was a BIOC. Over the years, courts identified five possible dates on which a buyer may be viewed as having achieved the status of buyer in ordinary course: (1) the date of initial contract; (2) the date the goods are identified; (3) the date title passes to the buyer; (4) the date the buyer gets delivery; and (5) the date the buyer accepts the goods.[13] Of these five, though, only transfer of title and identification ever received serious consideration.[14]

In 1999, however, the drafters of the Uniform Commercial Code added the requirement that a buyer must either "take[] possession" or "ha[ve] a right to recover the goods from the seller under Article 2" to the definition of a buyer in ordinary course. The Kansas legislature adopted the change in 2000.[15] Kansas courts have yet to address the question of what effect this addition has on earlier formulations of when a buyer attains BIOC status. Further, it does not appear that any other court has spoken on the issue.

The Supreme Court of Kansas has noted that when courts are called upon to review the effect of an amendment on a statute, they must "presume the legislature had and acted with full knowledge and information as to the subject matter of the statute, as to prior and existing law

---

[12]*See, e.g., Big Knob Volunteer Fire Co. v. Lowe & Moyer Garage, Inc.*, 487 A.2d 953, 957 (Pa. Super. Ct. 1985); *Daniel v. Bank of Hayward*, 425 N.W.2d 416, 419 (Wis. 1988).

[13]*See, e.g., Daniel*, 425 N.W.2d at 419.

[14]*Havens Steel Co. v. Commerce Bank, N.A. (In re Havens Steel Co.)*, 317 B.R. 75, 82 (Bankr. W.D. Mo. 2004).

[15]The change became effective on July 1, 2001.

and legislation on the subject of the statute and as to the judicial decisions with respect to such prior and existing law and legislation."[16] It has further stated that courts are to presume that "the legislature does not intend to enact useless or meaningless legislation,"[17] and, when the legislature revises an existing law, that "the legislature intended to change the law as it existed prior the amendment."[18]

In light of these canons of statutory constructions, the Court concludes that a buyer must only satisfy the requirements listed in Kan. Stat. Ann. § 84-1-201(9) in order to attain BIOC status. At the time the legislature adopted the revised definition of a buyer in ordinary course, the debate over when a buyer acquires BIOC status had been raging for over two decades. Both the commentators and courts had identified the ambiguity in the former definition and had suggested different points in time that a buyer could obtain BIOC status.[19] However, the revisers of Article 1 of the UCC and the Kansas legislature chose to confer such status when the buyer "obtains possession or the remedial right to obtain possession of the goods vis-a-vis the seller."[20]

---

[16]*In re Adoption of G.L.V.*, 286 Kan.1034, 1041, 190 P.3d 245, 252 (2008) (internal quotation marks omitted).

[17]*Hawley v. Kan. Dept. of Agric.*, 281 Kan. 603, 631, 132 P.3d 870, 889 (2006).

[18]*State v. Van Hoet*, 277 Kan. 815, 826, 89 P.3d 606, 615 (2004).

[19]*See, e.g., Energy Co-op, Inc. v. Periman Corp. (In re Energy Co-op, Inc.)*, 94 B.R. 975, 979 (N.D. Ill. 1988) (time of sale); *Mitchell v. Transamerica Commercial Fin. Corp.*, 236 B.R. 407, 416 (Bankr. D. Or. 1999) (identification); *Kit Car World v. Skolnick*, 616 So.2d 1051, 1053 (Fla. Ct. App. 1993) (time of sale); *Ladd v. Ford Consumer Financing Co., Inc.*, 550 N.W.2d 826, 831 (Mich. App. 1996) (acquisition of title); *Big Knob Volunteer Fire Co.*, 487 A.2d at 958 (identification); *Daniel*, 425 N.W.2d at 423 (same); *Chrysler Corp. v. Adamatic, Inc.*, 208 N.W.2d 97, 106 (Wis. 1973) (transfer of title), *overruled by Daniel*, 425 N.W.2d at 421; David Frisch, *Buyer Status Under the U.C.C.: A Suggested Temporal Definition*, 72 IOWA L. REV. 531 (1987) (buyer has a possessory remedy); Hal M. Smith, *Title and the Right to Possession Under the Uniform Commercial Code*, 10 B.C. INDUS. & COM. L. REV. 39, 61 (1969) (possession); Lori S. Segal, Note, *The Buyer-Secured Party Conflict and Section 9-307(1) of the UCC: Identifying When a Buyer Qualifies for Protection as a Buyer in Ordinary Course*, 50 FORDHAM L. REV. 657, 687 (1982) (identification).

[20]David Frisch, *Revised Article 9: A Primer for the General Practitioner*, 35 U. RICH. L. REV. 813, 835 (2001).

The Court finds this revised definition significant and will not judicially graft into the statute requirements that were not specifically included by the drafters.[21] As a result, Whitham is entitled to BIOC status if it can show that it took possession of the corn in question.[22]

In its briefing, Whitham asserts that the possession requirement can be satisfied through constructive possession, and that it constructively possessed the corn that it prepaid for. In support of its position, Whitham cites to *United Bank of Iowa v. Independent Inputs (In re Western Iowa Limestone, Inc.)*[23] and *Havens Steel Co. v. Commerce Bank, N.A. (In re Havens Steel Co.)*[24]. SSB does not challenge Whitham's first assertion other than to say that it believes that the appellate courts of Kansas have never addressed the issue.[25] However, SSB does take issue with Whitham's second assertion – that it took constructive possession of the corn that it prepaid for.

The concept of constructive possession is not well developed in the civil law context in Kansas. Much of the courts' treatment of the concept has arisen in criminal cases. In those cases, Kansas courts have focused on the accused's measure of access to the place where the

---

[21] *See State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85, 87 (2006); *see also Carroll v. Wyo. Prod. Credit Ass'n*, 755 P.2d 869, 873 (Wyo. 1988) ("Omissions of words from a statute must be considered intentional on the part of the legislature.").

[22] Whitham does not argue that he had a right to recover the grain under article 2. SSB does not allege that Whitham acted dishonestly during the transaction or that any other of § 1-201(9)'s requirements are not met.

[23] 538 F.3d 858 (8th Cir. 2008).

[24] 317 B.R. 75 (Bankr. W.D. Mo. 2004).

[25] Because SSB does not challenge Whitham's contention that the possession requirement can be satisfied through constructive possession, and the Court concludes that Whitham did not constructively possess the corn, the Court will not decide the issue of whether the possession requirement can be satisfied through constructive possession.

contraband is kept and their right of control over it.[26]  The Court has not discovered one case where the concept of constructive possession was discussed in the UCC context, let alone Kan. Stat. Ann. § 84-1-201(9).  As a result, it is not clear how the Supreme Court of Kansas would determine whether constructive possession had occurred in a case similar to this one.

In cases where it lacks instruction on how a state's high court would resolve an issue, the Court can look to "decisions of other courts [to] inform [its] analysis."[27]  One recent case where constructive possession was discussed in the § 1-201(9) context is *In re Havens Steel Co*[28].  In that case, the United States Bankruptcy Court for the Western District of Missouri was called upon to settle a dispute between a debtor's lender and one of the debtor's buyers over whose interest took priority with respect to steel that remained in the debtor's possession.  The buyer claimed that because it had prepaid for the goods and the goods were identified, it constructively possessed the steel in question, and, thus, qualified for BIOC status.  The court agreed.  It stated that the buyer's payment for and receipt of title to the goods in question was sufficiently strong to imbue the buyer with constructive possession of the steel.[29]

Another recent case where a court had to determine whether a debtor's buyers constructively possessed goods that they had prepaid for but remained in the debtor's possession is *In re Western Iowa Limestone, Inc*[30].  There, the buyers had purchased a substantial amount of agricultural lime from the debtor.  At the time the purchases took place, the lime was in

---

[26]*See, e.g., State v. Washington*, 244 Kan. 652, 654, 772 P.2d 768, 771 (1989).

[27]*Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1575 (10th Cir. 1984).

[28]317 B.R. 75.

[29]*Id.* at 87.

[30]538 F.3d 858.

-12-

existence and was identified to the contract. The parties agreed that title would pass at the time the agreement was entered into and that the lime would remain in the debtor's quarry until the buyers demanded it. Viewing these facts as a whole, the Eighth Circuit concluded that the buyers had constructively possessed the lime left at the debtor's quarries.[31]

Although neither of these cases set forth a test for determining whether constructive possession has occurred, they are nevertheless instructive on the issue presented here. These cases show that a buyer's prepayment is not sufficient, in and of itself, to establish constructive possession; it takes something more. The question, though, is how much more. Under what circumstances is a prepaying buyer's right or ability to possess an object strong enough to give rise to the legal effect of possession in the absence of actual physical possession?[32] After reviewing the relevant sources, the Court believes that, at a minimum, the goods that the prepaying buyer is claiming to have constructively possessed must have been identified to the contract. The reason for this is simple: without identification the buyer can have no legitimate claim to possess or control the goods.[33]

To determine whether a good has been identified, the Court must look to Kan. Stat. Ann. § 84-2-501. Section 84-2-501 states that identification may be made at any time and in any manner explicitly agreed to by the parties. In the absence of such an agreement, identification occurs when the contract is made if it is for the sale of goods already existing and identified or, if

---

[31] *Id.* at 867.

[32] *In re Havens Steel Co.*, 317 B.R. at 87.

[33] *See* Kan. Stat. Ann. § 84-2-105(1) (stating that goods must be identified in order for the buyer to have an interest in them).

-13-

the contract is for the sale of future goods, when the goods are shipped, marked, or otherwise designated by the seller as goods to which the contract refers.

On appeal, neither party contends that Whitham and Sunbelt explicitly agreed that identification would occur at a particular time or in a particular manner. As a result, the relevant inquiry is whether the goods were in existence at the time the contracts were entered into. As noted above, the factual record does not reflect how much corn was on hand at the time the CSPs were executed. Whitham argues that the evidence presented supports a reasonable inference that sufficient corn existed. The Court is doubtful that the evidence does in fact support such an inference.

Nevertheless, assuming for the moment that sufficient corn was in existence, the question then becomes whether the corn was identified. According to comment 5 of the Official UCC Comments to § 84-2-501, the making of a contract with reference to an undivided share in an identified fungible bulk is sufficient to establish identification. In its briefing, SSB argues that a fungible bulk was not identified in the contract, and, as a result, identification did not occur. Whitham argues that the contract between the parties does not need to expressly refer to an identifiable fungible bulk in order for identification to occur.

Whitham's position is erroneous. The Supreme Court of Kansas has already addressed the question of whether the contract at issue must identify the bulk in order for identification to have occurred, and has held that it must.[34] Under the doctrine of *Erie Railroad Co. v.*

---

[34] *See Reeves v. Pillsbury Co.*, 229 Kan. 423, 427-28, 625 P.2d 440, 445 (1981).

*Tompkins*[35], the Court is bound by this decision,[36] unless it believes that the Supreme Court of Kansas would no longer follow this decision.[37] Whitham has not provided the Court with any basis to believe that the Supreme Court of Kansas would not follow its earlier decision. Furthermore, the Court has found none. Therefore, because the bulk was not identified in this case, the Court concludes that identification did not occur. As a result, as a matter of law, Whitham cannot qualify for BIOC status. Accordingly, the bankruptcy court's conclusion that Whitham was not a BIOC is affirmed.

**Doctrine of Equitable Subordination**

In the proceeding below, Whitham also argued that its interest in the proceeds was superior to SSB's because of the doctrine of equitable subordination. "[U]nder principles of equitable subordination, [a court may] subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest."[38] Before the remedy of equitable subordination can apply, though, the following three elements must be established: (1) the claimant has engaged in some type of inequitable conduct; (2) the misconduct has resulted in injury to the creditors or conferred an unfair advantage on the claimant; (3) subordination of the claim must not be inconsistent with the provisions of the

---

[35]304 U.S. 64 (1938).

[36]*Paul Revere Life Ins. Co. v. Stanfield*, 151 F.2d 776, 776 (10th Cir. 1945).

[37]*Rock Island Imp. Co. v. Helmerich & Payne, Inc.*, 698 F.2d 1075, 1078 (10th Cir. 1983).

[38]11 U.S.C. § 510(c)(1).

Bankruptcy Act.[39] As noted by the Circuit, "[t]he critical inquiry is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated."[40]

Inequitable conduct for subordination purposes encompasses three categories of misconduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego.[41] The level of scrutiny that the Court employs when determining whether the defendant has engaged in conduct sufficient to subordinate their claim is based on whether the defendant was an insider or a fiduciary of the debtor.[42] In cases where the defendant is found to be an insider or a fiduciary, the party seeking subordination must only show that the defendant engaged in unfair conduct.[43] However, when the claimant is not an insider or fiduciary, the party seeking subordination must "demonstrate even more egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation."[44]

In its order, the bankruptcy court did not explicitly make a finding of whether SSB was an insider. Rather, it simply stated that because Whitham failed to point to anything in the

---

[39]*Sloan v. Zions First Nat'l Bank (In re Castletons)*, 990 F.2d 551, 559 (10th Cir. 1993).

[40]*Sender v. The Bronze Group (In re Hedged-Investments Assoc., Inc.)*, 380 F.3d 1292, 1300 (10th Cir. 2004) (quoting *In re Castletons*, 990 F.2d at 559).

[41]*In re Hedged-Investments Assoc., Inc.*, 380 F.3d at 1301*; see also Carter-Waters Okla., Inc. v. Bank One Trust Co., N.A. (In re Eufaula Indus. Auth.)*, 266 B.R. 483, 489 (B.A.P. 10th Cir. 2001) (stating that it is not sufficient for the party claiming that the doctrine of equitable subordination should apply to simply allege that the defendant has engaged in inequitable conduct; rather, the party seeking equitable subordination must allege conduct that fits within one of these three categories of misconduct: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) control or use of the debtor as an alter ego for the benefit of the claimant).

[42]*In re Hedged-Investments Assoc., Inc.*, 380 F.3d at 1301.

[43]*Id.*

[44]*Id.* at 1301-02.

-16-

record that supported a finding of wrongdoing on the part of SSB, regardless of what level of scrutiny applied, SSB was entitled to judgement as a matter of law on Whitham's equitable subordination claim.

On appeal, Whitham challenges the bankruptcy court's holding on two grounds. The first ground is that SSB did not satisfy its initial burden on summary judgment, as the extent of SSB's factual argument regarding the issue of equitable subordination was that "Whitham cannot come close to making [its] showing." The second is that a factual question as to whether SSB engaged in conduct sufficient to warrant equitable subordination exists.

Whitham's first argument is easily dispatched. The moving party does not need to prove a negative on an issue that the opposing party must prove at trial.[45] Rather, the moving party only needs to point to an absence of evidence in support of the non-moving party's claim,[46] which is what SSB did in this case. Here, SSB first identified the conduct that Whitham would have to prove at trial in order for the doctrine apply. After doing this, SSB then stated that Whitham's evidence was insufficient to make that showing. The Court finds that this is enough to satisfy SSB's initial burden.[47]

Whitham's second argument can also be easily dispatched. Because Whitham did not allege, much less put forth any evidence, that SSB was an insider or fiduciary of Sunbelt, Whitham had to point to evidence that showed that SSB's conduct was "gross and egregious,

---

[45]*Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001).

[46]*Trainor v. Apollo Metal Specialities, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

[47]Even if SSB had not met its initial burden, the bankruptcy court could have still granted summary judgment to SSB if the record demonstrated that no genuine issues of material fact existed. *See Kannady v. City of Kiowa*, 590 F.3d 1161, 1170 (10th Cir. 2010) (stating that, even if the moving party fails to meet their initial burden, a court can nevertheless grant summary judgment if the record before it supports such a holding and the non-moving party is not procedurally prejudiced by its action).

tantamount to fraud, misrepresentation, overreaching or spoliation, or moral turpitude."[48] In its briefing, Whitham pled the following facts in support of its claim that SSB's conduct was gross and egregious:

    a.  The Bank sat on its rights after Sunbelt's default for nearly four months;

    b.  The Bank did not file its foreclosure action until after Whitham's November payments and all the corn was in Sunbelt's inventory;

    c.  Based upon its lending relationship with Sunbelt, James Arnold and the Bank were aware that Whitham was good for its November payments;

    d.  The Bank took Whitham's money in the form of its sweep and the checks made out to it and the related entities as dual payees;

    e.  The Bank knew it took Whitham's money as evidenced by James Arnold's statement to Stewart Whitham;

    f.  Before Sunbelt could deliver more than 56,000 bushels of Whitham's corn, the Bank foreclosed on Sunbelt;

    g.  The Bank filed an involuntary bankruptcy petition rather than work out a deal that would allow Whitham to access its corn.

The Court finds that this evidence is insufficient to carry Whitham's heavy burden. Whitham's evidence simply does not raise a factual issue as to whether SSB engaged in conduct tantamount to fraud, misrepresentation, overreaching or spoliation, or moral turpitude. At best, the alleged conduct shows that SSB engaged in a sharp business practice. However, a sharp business practice is not a sufficient basis for equitably subordinating a claim made by a party that

---

[48]*In re Eufaula Indus. Auth.*, 266 B.R. at 489 (internal quotation marks omitted).

is neither a insider nor a fiduciary.[49] As a result, the Court finds that bankruptcy court correctly concluded that the doctrine does apply in this case.[50]

## IV. CONCLUSION

Because it concludes that Whitham was not a buyer in ordinary course and that the doctrine of equitable subordination is not applicable, the Court AFFIRMS the judgment of the bankruptcy court finding that SSB's perfected security interest in Sunbelt's assets entitled it to a priority claim against the grain and its proceeds superior to Whitham's claim.

Accordingly,

**IT IS THEREFORE ORDERED** that the bankruptcy court's June 18, 2009 Order granting SSB's motion for summary judgment is AFFIRMED.

**IT IS SO ORDERED.**

Dated this 31st day of March, 2010, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[49]*See, e.g., Badger Freightways, Inc. v. Cont'l Ill. Nat. Bank & Trust Co. of Chi. (In re Badger Freightways, Inc.)*, 106 B.R. 971, 976 (Bankr. N.D. Ill. 1989) (noting the fact that a non-fiduciary "can act strategically to protect its interest to the potential detriment of similarly situated claimants").

[50]Because the Court concludes that the first prong of the equitable subordination is not met, it finds it unncessary to address the final two prongs. *See Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1282-83 (8th Cir. 1988).